morning your honor may it please the court Stephen Rosenthal on behalf of the plaintiff's steering committee on behalf of the families of a hundred victims of the Spanair crash like to reserve seven minutes for rebuttal if I may. What firm are you with? My law firm is Pothurst Orsak in Miami Florida your honor join with me our counsel from around the country who also represent various members of the plaintiffs in the steering committee. Your honors this case requires reversal because the district court misbalanced failed to appreciate the weights given to certain critical factors in the forum non-convenience analysis and that mis-weighing has been underscored by events that have occurred since this appeal was filed. This case has an unusual mix of ingredients that distinguishes it from the mine run of  dismissals on. Specifically we have the undisputed failure of an American designed and made part whose only purpose is to warn of pilot error which takes the pilot error aspect of the case largely out of the equation. In addition with respect to that part or product the takeoff warning system the United States regulators the federal government has expressed a heightened concern about the a consideration that's not present in any of those FNC dismissal cases is that the plaintiffs have been willing to stipulate and have conceded since early on in the case two of the critical areas of evidence that the defendants say they want to base a defense on. What happened in the cockpit and what happened with the ground maintenance of this aircraft. As a result of those unique characteristics of this case the district judge should have but did not weigh the evidence differently. I've read the district court's order very carefully. It's a very thorough and very complete order. Where did he go wrong in balancing? Which factor, the public interest factors? He first argued it was an inadequate form. That's really not going to get you very far except especially now that apparently the criminal prosecutions have been dismissed. Correct. So a large chunk of your argument focused on the argument that Spain was an inadequate form given the delays. That's gone. No doubt. Now you're stuck looking at the balancing that was done. I'd like you to pinpoint, tell me which factor the district court improperly balanced. I'd like to do that. I'd like to walk through it. It'll take some time. Let me first before I move into that address the one issue that you pointed out, Your Honor, which is that obviously the recent events in Spain with the conclusion of the criminal court inquest, if you will, places a definite period of time that this case was stayed had it been sent to Spain or originated in Spain four years ago. And so we'll rest on our briefs on that issue. And I do think we need to focus on other issues that we did emphasize. Yes, that's correct. And the district court. And you need to establish that the district judge abused his discretion. Correct. By finding that the public factors and the private factors taken together weighed toward moving the action to Spain. Correct. And I want to emphasize that standard of review. There's no question that it's abuse of discretion, but this court has also said that where a court fails to accord appropriate weight to certain factors based upon the appropriate way of looking at it, which is, and actually, Your Honor, Judge Paez, in the case, I know you're very familiar with this, you authored that opinion in a foreign air crash case, said that the court must, quote, evaluate the materiality and importance of the anticipated evidence and witnesses' testimony, close quote, before determining their accessibility and convenience. And in writing that standard, you were adopting the Gates versus Learjet case from 1984, which Judge Pragerson sat on the panel on. And so I know that this court is very sensitive to the importance of the materiality and the importance of the evidence that is predicted to be pertinent to a trial in the case when evaluating each factor. And to get back to Judge Paez's question, which factors, public interest and private interest, have been improperly weighed, when you take into consideration, and I would say most strenuously, the most important distinction that the district judge did not particularly give weight to, is the plaintiff's concession and how that impacts the type of evidence going to be necessary. Let me just do a summary before getting into the details. Would you focus on, first, on the private interests? You represent a group of people, none of whom are United States residents. That's correct. The great majority of whom are Spanish nationals. Describe for me why their private interest in pursuing the case in the United States makes the district judge's finding an abuse of discretion. Okay. I'll approach it from the angle of your question first, which is that, obviously, we know from the Supreme Court on down, since 1981 in Piper v. Reno, that even if you're a foreign resident, you're still entitled to deference in your forum's choice, not as much as if you were a U.S. resident, but there is still deference. There's a slight thumb on the scale. And that's coincident with the plaintiff's right to choose his or her forum, decide whom to sue and which claims to bring. So we start with that presumption. It's not like they sued somebody, a company from Mexico and Japan, in a California courtroom. The defendants are primarily all United States corporations. McDonnell Douglas, which designed and manufactured the aircraft, is in Long Beach. Boeing has since obtained McDonnell Douglas. Leach Corporation is in California, which manufactured a particular component, this R25 relay, which is suspected as being the culprit for the electrical power failure to the takeoff warning system in the aircraft. Let me tell you why I'm going to ask you to pause, because I want to go back to Judge Paz's question. I read the district court opinion pretty carefully, too, and the district court considered seven private interest factors. Tell me which one of those the district court got wrong, and why, in light of its other findings, that was an abuse of discretion. Let me highlight three, and I'd like to go through them all. First, he said, in his initial opinion and then upon reconsideration, that, or at least he gave the indication that he gave the most importance to the inability to join Spanair, the carrier, which is now bankrupt. That issue is a problem primarily because of the stipulations that the plaintiffs are willing to make, and that the defendants have evidence about, pilot error and ground maintenance. Both of those factors are the main reasons that the defendant would want to have Spanair in the case. Let me ask you just one, just to make sure I understand. So your claim, the way you portray the case is that, yes, there was pilot error. That's uncontested. All right. So there's pilot error, but that pilot error was not the proximate cause of the accident. Is that it? That's right. The nature of this product, the takeoff warning system, presumes pilot error. That is its function. When the pilots fail to misconfigure the flaps and the slats on the wings for takeoff to increase the drag and the lift, the system warns them and says, the wings and slats, the slats and the flaps are not correctly configured. The precursor, the but-for requirement of the TOWS system to be activated and relevant is that the pilots have made a mistake. And that's a very interesting feature. Is it your contention here that this pilot error that you acknowledge cannot overcome any design defect in the takeoff system? If I understand your question, does the fact that there was pilot error make the TOWS system defect irrelevant? Yeah. Right, no, of course not. I mean, our position is, and it's frankly the position of the FAA and the NTSB for 20-plus years, that the TOWS system- Let me stand corrected. Is it that if you can show a design defect, if you can- Correct. All right. Will that trump any pilot error? It will, and I think that here's the way I- No apportionment of liability? I'm sorry? Is this a case where the pilot error, would there be apportionment of liability? Well, it's an interesting question you raised, Judge Hurwitz. Here's- Because I have no idea what Spanish law says on that subject. Right, well, I believe that the Spanish law is a little bit unclear on that. I can tell you that I know that certainly the three fora in which this case was filed in the United States, California, Florida, and Illinois, and your question goes beyond the record, but I will respond this way. All three of those states do have a system in which a non-party tortfeasor, who is not a defendant, still goes on the verdict form because- Yes. Sorry? No, yes, that's right. Right, and so- So if tried in the United States, there would be some apportionment of liability. That's right. Boeing and the other manufacturer defendants would only be responsible for their share of fault, and I think that goes to your question, Your Honor, which is, is the pilot error aspect of a trial in this case a relevant thing? Of course it is, because they have a right to defend by saying, look, look how bad these pilots were. Well, let me ask the contrary question. If it's not clear that there's apportionment of liability in Spain, which is to say you'd be able to recover the entirety of your damages, why aren't you better off in the Spanish forum on that issue? Well, number one, it's not clear that Spanish law is going to apply to that issue in a US court. Secondly, there are a lot of reasons, and the main reasons that the plaintiffs filed suit here is access to the evidence. There is a tremendous amount, now we're into the private factors and the private interests, there's a tremendous amount of evidence that is here in the United States. It's uncontested that there are hundreds and hundreds of boxes of technical documents located in Long Beach. Well, but the fact that there are boxes of technical documents doesn't, I don't know if that really helps you that much, because you could just digitize it and send it across the, you know, very easily. Agreed, but that's not the issue, assuming that these are documents. You still have to translate all these things. Or they can be translated anywhere. In the cost associated with translating technical documents of this volume, we're talking about a many decade history of federal and manufacture, federal agency and manufacturer discourse about this particular document. Yeah. And, and, and let me just, let me come back to the discourse. Let me ask you this. Who, who has the deep pocket here? The deep pocket, or at least the defendants whom we sued, are American manufacturers. Basically Boeing Corporation, Leach Corporation, the companies in the United States. Spanair, whom they have pointed to as the place where we can get recourse, is now bankrupt. What, what does a bankruptcy mean? I'm not, if they were in bankruptcy in the United States, it might well mean that large claims could be filed against them. Here's what we know from the record, from what has been put forth before the court on a notice for judicial notice, that the claimants, the plaintiffs in these cases, are 11th in priority in claims. 11th in priority in claims in Spain. It is unclear, therefore, whether there will be any money to pay them. And secondly, it appears, and my understanding is that this is more of a dissolution than a restructuring. So, as the bankruptcy implicates the issues affecting this case for an FNC balancing, it's not clear that Spanair can produce witnesses anymore. Number one, we submit that they are irrelevant, or largely irrelevant, because, and I want to get into this, the evidence of what happened on the ground in Spain is conceded. We have agreed to stipulate to those facts. An expert from their side can testify to their heart's content about these facts that occurred in the cockpit and with maintenance. And they all are the precursor to the real issue in the case, which is, was the failure to have a redundant warning system a violation of United States law? Because, and I'm meandering a bit, but United States law is ultimately where the rubber meets the road in this case. Why is United States law applicable to this accident? The question of whether or not the design was appropriate. No, I understand. But has there been any determination about choice of law in this case? Well, the district judge said that he didn't do a full analysis, as is not required at this juncture, but believed that there could be an argument that Spanish law might apply on certain issues. Right, so he found that to tip slightly towards the other side, right? Correct, but let me make two points about that while we're on the subject. One is that when he made the statement about choice of law, he assumed, at page 27 of his opinion, he said, because this forum's comparatively small interest in this case strongly favors dismissal, the choice of law issue's not really going to matter. Right, he said it was sort of neutral in his analysis. But I would submit to you that the premise of that statement, which is that the United States forum's interest is comparatively small, is a mistake. That is one of the principal mistakes that the district court made, which is not valuing enough the overwhelming, not even theoretical, but expressed Federal interests in aviation safety concerning this very product. And I would submit that that colored his balancing of both the choice of law factor and also, page 32 of his opinion, the burden on the local courts and juries. Well, if we adopted that argument you just made, I mean, that would trump just about any case. It would keep all cases here in the United States. Hyper aircraft would be overruled. Yeah. Well, no, I don't think so. With all due respect, here's why. There's a number of factors here, and I'm not placing all of the weight on that, but I'm saying that when you combine all the different factors here, where there are multiple errors in this balancing, all stemming from a failure to appreciate the unique features of this case, with the stipulations and the nature of the product, the stipulations and the nature of the product, and the U.S. expressed interest in this particular product. Well, focus on the U.S. expressed interest, because I understand your stipulations. Are there any cases in which courts of appeals have overruled, found an abuse of discretion by a trial judge, where all the victims were foreign nationals and the suit was brought, the suit was transferred to the nationality of the victims? It's a very interesting question. I can think of one case that I was involved in, that's why I can think of it. West Caribbean Airways in the Southern District of Florida has a very interesting opinion. It was a crash in Venezuela of a Colombian jetliner on the way to Martinique, France, and we represented the crew. And the court rejected a form of nonconvenience dismissal. Right, that was a district court. Correct. Yeah, I'm looking at this from our abuse of discretion review. Given that all the plaintiffs are from out of the country, and the crash occurred out of the country, is there any case you can cite to me where a court of appeals found that a district judge abused his discretion under those circumstances? As I stand here at the moment, maybe my co-counsel will tell me before I come back. You've got all the best aviation lawyers in the country here. Somebody will know. That's right. And I can't recall offhand. Let me do this, because I think it's valuable to the court. Let me, if you would indulge me, go through the factors. Do you have any other case that involved the slats being extended and the flats going down and take off? There is no other case that I'm aware of involving this issue where FNC was the issue. What? Where FNC was the issue. I'm not talking about that. I'm talking about a case in this country. Well, yes, Your Honor, then. As we briefed, and it's extensively discussed below, the Detroit crash in 1987 involved a McDonnell Douglas 80 series aircraft where everyone was killed. And the investigation, it was a domestic flight, so there was no debate about FNC and where the lawsuit should proceed. The result of that investigation. Well, I had one. It was a United flight out of LAX to Denver. I just want to see how quick you are. I appreciate that. But let me ask you this. So the Spanish airline is kaput. They're gone. That's our understanding. So wherever the money is going to come from is going to come from not from McDonnell Douglas. Boeing. From Boeing. And now, have there been any settlements with the deceased? Not to my knowledge, Your Honor. Not to your knowledge. Right. I believe the answer is no. You would know if that had happened. And again, my learned colleagues will inform you. Do they have comparative negligence in Spain? I believe in Spain there is evidence in the record that there is joint and several liability. I believe that there is joint and several liability. And I believe that's what the record states. What did you say? I believe it is joint and several. Joint and several. Yes. But not comparative. That is my understanding. So on that issue, which is what I tried to ask you before, wouldn't the balance tip towards Spain? No. And let me try to do this, because I think it's critical for this Court to understand in the time that I have remaining, the various factors where the district court, with all due respect to him, did not weigh in the significance of the stipulations and the nature of this product, which depends upon, for its only existence, failures by the pilots. First of all, to sum up, in the private interest factors, he placed incredible... Well, the pilots can see the slats, and they can see the flaps. Correct. And it's conceded that these pilots were negligent. They failed on many levels to do the necessary pre-flight checklists and to look outside and to observe things. However, the product at issue, the TOWS, take-off warning system, failed to give them the oral warning that they had messed up moments beforehand, which was fatal. The judge said inability to join Spanair is very heavily weighted in favor of dismissing to Spain. The bankruptcy and also the fact that all of the evidence can still come in in a U.S. courthouse undervalues or undercuts that heavy weighting away from us. He said that the witness factors are slightly favoring Spain, but he put too much importance on the weight of Spanish witnesses, particularly given the concessions here and the stipulations. By the way, in forum nonconvenience cases all the time, this Court and others will take a party's stipulations and say that factors heavily into the way that I value the mix because it impacts the practical reality of how a trial is going to play out in this case. The district judge did not give weight to the stipulations of the plaintiffs. There is not a single reference to it in his opinion. The witnesses we stipulated we bring as many damaged witnesses as possible within our possession and control to the United States and pay those costs. That offsets or at least is awash with the tremendous costs that would be inflicted upon us on the translation of hundreds of boxes of technical documents concerning the testing of this product. Secondly, on access of evidence, he said it slightly favors Spain, but he gave a totally uncritical evaluation of the evidence in light of the stipulations. I can give you some specifics. He says that the accident site was relevant. There's no evidence whatsoever that the accident site itself is relevant. He says uncritically that all of these are material, that the cockpit voice recorder and the digital flight data recorder are material. Well, of course, they're generally material, but the defendants have access to them. The defendants have an English transcript of what was said in the cockpit, and it's conceded. I fail to see how that causes significant weight on the tip to Spain. In terms of air traffic control. Are all of the passengers represented by U.S. attorneys? Well, we have 100 victims who are represented in the United States by American attorneys. Are you going to tell us how they got all those cases? I have no idea, Your Honor. So I can honestly say I couldn't answer your question. Are there other victims represented by Spanish attorneys who have brought separate cases in Spanish courts? Correct. There's a space, a small group, a small group. A case has been filed in Barcelona, had been stayed until recently, until that criminal court opinion came out. So they'll proceed in 2-4. If you were successful, these suits would proceed in 2-4. I cannot speak for what those lawyers in Spain will do, but if this Court were to reverse and to allow these to be, to proceed in the form that we think the evidence will be most able to be obtained on the issue that really is going to be litigated at trial, I cannot say that there will definitely be a case proceeding in Spain as well, particularly given the bankruptcy. The liability limitations on international flights, does it have, does the form have an effect on that? It does not. Both the United States and Spain adopt the Montreal Convention, but the reality is that all that does is give certain payments guaranteed from the air carrier to the victim's families. The air carrier is now bankrupt, so that issue is not helpful to anybody. What I'd like to do, if possible, is save some time for rebuttal. Well, I mean, what are the limits on the damage? A hundred thousand special drawing rights, Your Honor. A hundred thousand. Correct. And I do not know, it's not in the record, you asked about settlements, whether or not Spanair has actually paid out those amounts to the families or not. What's the value of that? I have to ask my co-counsel for the specifics, Your Honor. If I may. Sure. I mean, I'm just curious. Your Honor, I'm happy to address a couple points. The hundred thousand special drawing rights is about $150,000 or $60,000 U.S. It's not a limit, per se. It is a, it is what, let's put it this way. Victims are entitled to that amount and all of their damages unless the airline can prove that they took all reasonable precautions to avoid the accident. So in other words, it's a. Minimum. It's a minimum that they would get if they prove those damages. But more importantly also. So this is something, when did all this happen? This is actually, this is part of the Montreal Convention that was a modification of the old Warsaw Treaty. When was that? Oh, I'm sorry if I can't give you the exact date, Your Honor. There's a couple of changes that went from Warsaw to get to the latest Montreal. In fact, a couple of them were called the Montreal Protocol, which further muddies things in my mind as to dates. But also, this flight was from Madrid to the Canary Islands, which is also Spanish. So there are only Montreal issues as to very few passengers on the aircraft who were part of a different leg coming from outside of Spain. It only applies to the non-Spanish passengers. Very few passengers are Montreal passengers. Oh, okay. Thank you, Mr. Martinez. Sid, I'd like to address the differences between the LUAC opinion, but I think if I can just have a few minutes on rebuttal to address the Court's questions. Thank you. Good morning, Your Honors. I'm Eric Wolfe. I'm with the LUAC from a Perkins Coulee. Dan Ridlon is with me at Council Table. We're counsel for the defendants. That's Boeing, Leach, Esterline, Amatek, Eaton, and Honeywell. Do you represent Boeing? I do. May it please the Court, Your Honor is focused on the standard of review, which is abuse of discretion. And in this area, it's been emphasized that the district court has to pretty clearly be unreasonable in its analysis of these matters. And the opinion is, it was described as thorough. It's very thorough. And I'm just going to talk about some of the ways in which the district court kind of, Judge Fies went out of his way to credit the theories of the other side and their analysis of what evidence they would need. And it's all right there in the opinion. And it's very difficult for them to say that there was any abuse of discretion there. So their theory is that you have to look at the whole certification history here. It goes back to the late 1970s and then up through Detroit and sort of things that happened after that. And Judge Fies credited all that. If you go to the private interest factors when they're analyzed in his opinion, he says that. That there will be witnesses that Boeing will not have any power over. They're not employees anymore. There will be regulators. Some may not be with the agency. Boeing doesn't have any control over that. At each of those junctures, Judge Fies is crediting their theory. So their main overarching point on the private interest factors just does not bear out in the opinion itself. The district court definitely gave their theory as much weight as it deserves. How do you respond to their whole argument is we're willing to stipulate the factual events in the cockpit. And really what the case really boils down to is it's our obligation to prove that there was a designed effect. And that's a technical hurdle that we're going to have to meet. And there are a lot of technical documents. There are a lot of experts here in the United States. And it would be more convenient in light of our willingness to agree to what happened in the cockpit for it to be heard here in the United States. Where does that break down? I have several responses. First, Your Honor's got a sense of kind of the illusory nature. Why does Boeing want to go to Spain? Boeing wants to go to Spain because it is the only forum where you can get everyone together, and especially Spanair. And this goes to Judge Fies' question. The defense in this case is exactly the question you put to Mr. Rosenthal. The defense in this case is we're not the proximate cause. The pilots are the proximate cause. Spanair is the proximate cause. And in the final report from the Spanish investigators, they set out. And the briefs actually, to Your Honor's, do not sort of go through every error that was made. There was a series of tragic misses by that crew, any one of which would have saved this flight. And some of which are due to Spanair policy. In the United States, the takeoff warning system would be checked before the flight. You'd make sure that it works. You do full thrust to both engines, and you make sure that that warning is there. They didn't do that. There's an afterstart checklist, and it has checking the slats and flaps. And it's right there in the checklist. And they're going through the checklist, the first officer and the captain. And they get to the check of the flaps and slats. And the captain is getting irritated that it is taking so long to get away on this flight that's been delayed because of a maintenance problem. And he interrupts the checklist and says, talk to air traffic control. And they just skip that item. They skip it. They never get an answer to that. They then are supposed to do a takeoff briefing, which would have covered it again. They're running late. They skip that. And if you could hear the cockpit voice recorder, which all Mr. Rosenthal would concede is that you will have an English language transcript. If this case were to be tried, and if it were to be tried fairly, the cockpit voice recorder would be the single best evidence for the defendants. And it should be heard by native Spanish speakers who can understand the irritation of people's voices, so that they understand that the first officer is calling his girlfriend on his cell phone, so that they get all these nuances of what's going into that cockpit. Because our defense is there is your proximate cause. It's what was going on in the cockpit. Well, they say, okay, given all of that, nonetheless, if this system, if this warning system had been functioning properly, that's all. Right. Given all that outrageous conduct, this whole accident could have been avoided. Okay, so the second part of that defense, and the reason why all that evidence is so relevant, and it is so oppressive to try and have a trial without it, is that properly put on before a jury, the jury will reach the conclusion that a warning wouldn't have mattered. They got warnings. They get a stall warning as soon as the plane leaves the runway. And there are two comments, apparently. This is in the report. There are two comments. The first officer asks in a questioning voice, engine failure? They don't know. They don't understand why they're getting this warning. And then the captain says, can we turn that off? And by the way, this is one of the problems with warnings. It may sound, you know, it's always easy and retrospective. You just put on another light. You have some announcing voice or whatever. What was the warning that would have gotten here? It's a buzz? Yeah, it's a loud alarm sound. And then they get a stall warning that is an alarm and stall, and they don't know what it is. They get stick shaker. They don't know what it is. If they could have extended, and the final report is clear on this, if they could have extended when they got those warnings, they could have saved the flight. Tell me how, assuming all that to be true, and I'm not sure all that's covered by stipulations, how does the case try differently in Spain given that the people who ignored all those warnings are dead? I think over in Spain, first of all, you have a court that has compulsory power over the folks at Spanair. And whether Spanair is bankrupt or not, a Spanish court has compulsory power over those folks, and a United States court does not. You have to go asking. You have to request to talk to some of those people. And the plaintiff's willingness to come here doesn't extend to the Spanair people, obviously. But some of what I just described, which is just a snapshot, but some of what I just described, some of that is Spanair policy decisions. McDonnell Douglas and Boeing recommended to operators test that takeoff warning system before every flight. They did not have that as a policy. They had it as a sort of first flight of the day but not after that. We can speculate, but if they had checked it, given the nature of what was going on with the rat probe, the heater, it wouldn't have sounded if they had checked it before the flight. It wouldn't have sounded because the plane, due to whatever was going on there, the plane thought it was in the air. And so the systems that go through that relay that would apply on the ground were not going to sound because the plane thought it was in the air. But that's a Spanair policy decision. How they do those checklists is a Spanair policy decision. How they train their pilots, whether they train their pilots properly for stall warnings, those are Spanair policy decisions. And all of that would require bringing in Spanair people and bringing in Spanair documents, and the district court has no power over any of that. If I could say, you know, all these comparisons to Detroit, let me say a couple things about Detroit. First of all, in Detroit, the pilots pull the circuit to turn it off. And this is one of the things that happens when you have warnings. If they're not accurate, if the pilots get nuisance warnings and things like that, they ignore them. They want them turned off, just like in our case where they get a stall warning and the captain says, can we turn that off? Because if they're getting nuisance warnings, then they start thinking, they don't know whether that warning is real or not. So in Detroit, the crew actually, they pull the breaker on that. This is not the same factual scenario as Detroit. But secondly, in Detroit, you had a full trial where you could bring in all the kinds of evidence, like I'm talking about, the Northwest Airlines history with those pilots and the pulling of circuits and other policy decisions, and an American jury found Northwest Airlines 100% liable and the Sixth Circuit affirmed it. So that's proximate cause. That's the defense that would be put on in this case. You didn't, a warning is not why that, lack of a warning, an extra warning. There are lots of warnings. Lack of an extra warning is not why this tragedy occurred. This tragedy occurred because of a series of mistakes and choices by Spanair and the crew. Do you know if Spanair, if Spanish law recognizes comparative fault? Yeah, so on that, Your Honors, I just made a note while there was that discussion, and it said excerpts of record 150 is the defense expert on Spanish law, Salvador, and his testimony was that they do. If everybody's in the same proceeding, you can allocate. There is joint and several liability in the absence of that, but you can allocate, and that's at excerpts of record 150. And just, you know, on the final discussion you just had before I got up here, on the damages, it's not Montreal, as was explained. It's an EU regulation tracking Montreal, but that's at excerpts of record 138. The first 100,000 special drawing rights, the first, you can find these conversions on the Internet, probably like $153,000 today. But those are claims against the airline. They're against the airline, and that first 100,000 special drawing rights, or first $150,000 U.S. dollars, is automatic. I'm sorry. I was just going to say 16,000 special drawing rights come within the first, I think, 10 or 15 days automatically. The point of these regulations is precisely to avoid what we're having here. It's to get the money out to the victims. And I was going to ask, does the record reflect whether or not money from the airline has gotten out to the victims? The first 16,000 SDRs to be compliant should have been paid. And does the record reflect that? I suspect there's a citation in the record that I'll have to check. One thing we did not hear about from the plaintiffs in talking about Spanair was Spanair's insurer, Mapfree. In Spain, the insurer can be held fully liable and pay all of these amounts we're talking about. And the bankruptcy is just a big red herring about what's going to happen here. We know right now, and it's in the record, the lawsuit in Barcelona, that is not just against Spanair. That lawsuit is against Spanair and Mapfree, the insurer. It's directly against the insurer. And the insurer is not bankrupt. And as aviation lawyers know, there are insurance minimums. These planes do not fly around unable to pay out on planes. There are EU regulations. The United States has laws. They have to carry a certain amount of insurance to be able to pay out the amounts in these situations. So, Judge Pregerson, you asked about deep pockets, and some pockets are deeper than others, but Mapfree is one of the pockets in this case that can make the plaintiffs whole. So what's the bottom line? For the plaintiffs, what's the true advantage, then, of being here in the United States, just access to the documents and witnesses? I think the true advantage, Judge Paez, and this plays out in a lot of these cases, but in this case, it's particularly oppressive to the defendants. They get American-style discovery for all their stuff, for everything they want, and we get letters of request and delay and sort of the continental system for everything we need to have a fair proceeding. So the true advantage is access to an American jury, isn't it, to be honest? Well, it could be, but then look at Detroit. But that doesn't mean you wouldn't rather try your case to an American jury than a Spanish judge. Absolutely. I think, no doubt, that that would be preferable. And I will say, you know, I don't want to make my own overblown comparisons to Detroit. In Detroit, mid-trial, there was a settlement with the plaintiffs, and then it was Northwest against McDonnell Douglas from there on out. Can I ask you the question that I asked your opposing counsel? Are you aware of any case in which a court of appeals has found an abuse of discretion by a trial judge in transferring a case for a nonconvenience? It's not really transferring, but dismissing for a nonconvenience, where the plaintiffs were foreign nationals and the stipulated forum was going to be their forum? So I think I'm aware of one. Okay. And I'm surprised Mr. Rosenthal didn't raise it because the plaintiffs have very, I think, conspicuously tried to weave it into their criticisms of Judge Fees, and that's the Van Schimdel case where Judge Fees granted FNC, and it was appealed, and a panel of this court, two to one, in an unpublished decision, found certain ways. This was a case where the plain runs into some stuff that was on the runway. And the panel, two to one, said, you know, we think Judge Fees didn't fully appreciate that this was a defect case, and Judge Kaczynski dissented and said, I know what's going to happen here. It's going to go back and it's going to say, I fully appreciated all that, and I do it again, and then he'll come right back and we'll affirm, and that's exactly what happened. So of all the judges who are not going to make that mistake in analyzing these sorts of things, Judge Fees is probably number one. He's not going to make that mistake. He's had a similar situation. He's had that argument placed against him before. And the plaintiffs in their brief kind of suggest, you know, here we go again. He's making that same error again, but he's not. He really isn't, and he goes out of his way to say, okay, your theory is 20, 30 years old in the making. You say you're going to need a lot of American evidence for that. Okay, I will weigh that in assessing witnesses and documents. And he did, and he said on that that it only slightly favors dismissal. He didn't say it resoundingly favors dismissal or anything like that, although we don't know, really. We don't have a lot of good precedent for how well we can get documents out of Spain. Take the cockpit voice recorder. Most of these cases, since Piper, because this case is so similar to Piper, and it's so similar to Luke, but since Piper, these cases all go overseas. We actually don't have a lot of test scenarios to find out, okay, if we kept one of these cases, could we get from Spain or some other country the actual cockpit voice recorder? Would they give it to us? And I know just from talking to people who have been doing this for the last 30 years, they don't think you'll ever get it because it's just not the kind of thing you would give over. And that Spanish agency rightfully thinks this is our case. And that's why on the public interest factor, just like in Piper, just like in Luke, the Spanish interest in this case is paramount.  And Judge Breyer got a case that tried to get a bunch of component manufacturers sued in the Northern District of California. And he said, this is not an American case. Americans wouldn't like it if you had a crash like Detroit and it got litigated over in France. That wouldn't make any sense. And the same thing here. This is a Spanish case, and they've invested a lot of resources. And these agencies invest an incredible amount of resources. It's like when you have cockpit voice recorders at the bottom of the ocean and things like that, they invest incredible resources to figure out what happened. It's their case. And so on that public interest factor, the district court did not abuse its discretion at all. Unless the panel has any further questions, I think I've covered everything I want to cover. The question of cause in this kind of situation is just a factual determination ultimately for the trier fact. Proximate cause? Yes. Like in the insurance context, you have like efficient proximate cause and whatnot. This is just a pure question of what was the true cause of the accident. I guess, yeah, the legally reasonable conclusion. I would say to get these cases resolved, and most of these cases don't go to trial, to get these cases resolved, getting everybody together in the same forum, so that you don't have some big speculative contingency, like a U.S. proceeding with only a portion of the responsible parties. If you want to get the cases resolved, everybody, including Spanair and Infinsure, being in the same forum, that will get the cases resolved. Money can go out, and then the defendants can figure out between themselves who's going to pay what portion of it. When was the accident here? I can't remember. It's August 20th, 2008. All right. Thank you. If it may, Your Honors, I'd like to try to make five points in very short time, and let me lead with the fact that this is not about where the case gets resolved and goes away. This is about whether or not the defendants have met their high burden of showing that this case was oppressive and vexatious out of all proportion to the convenience to the plaintiffs of bringing it here. It's a high standard. It should be a rarely invoked one. And what is distinguishing here, and I don't believe Mr. Wolf discussed it, is the stipulations, which totally distinguish this case from Lueck and Piper. Well, you know, they don't have to accept any stipulation you're proposing. Of course not. But as a practical matter, I think that they should. They should be able to tell your side of the story as well. Your Honor, I think I agree with you. I remember trying criminal cases in the district court, and the defense lawyers wanted to get the government to stipulate to certain things. And the response would be, no, no, we want to tell our side of the story. We want to make it come alive. We want to, just as he was saying, we want to, you know, play the tape recording and let people hear. I fully appreciate that. I think there's two things that mitigate against why that's a significant factor in the weight. One is that they will have the ability to do that through expert testimony. This material, which is stipulated to, is certainly appropriate for Rule 702 expert testimony. Mr. Wolf gave a very impressive presentation himself as the lawyer. An expert would have a field day with it, and they wouldn't have to pull it out of reluctant Spanish witnesses through piecemeal testimony. Number one, it would be very effective for them. Number two, I don't know that a district judge would allow in, under Rule 403, cumulative testimony over and over after it's been stipulated to. That's just not consistent with experience. So while there may be some small benefits to them of having a Spanish language, a transcript played in a Spanish court because they can, the jury can then, or actually not a jury, a judge can determine the inflection and so forth, so too are they perfectly capable and have had a Boeing pilot listen to the tape when it was played, convey that to a jury very effectively. It distinguishes Lueck and Piper, which I think is critical. As you point out, Judge Hurwitz, the pilots in those cases were, I'm sorry, in the pilot in Lueck was alive, the pilots. Two of them survived the crash. Here they are deceased. So it's not like there are critical eyewitness accounts from the most knowledgeable people aboard the aircraft that are being deprived of in this case. Although in Piper the pilot was deceased. In Piper the pilot did die. That's correct. And that point is not distinguishable. What is distinguishable on both accounts, in Lueck and Piper, is the plaintiff's stipulations here. And, frankly, those stipulations are not pure gratuitous efforts to sort of grab the case. Those are part and parcel of the nature of the product claim being made here, not even of the claim, of the product itself. And there's no doubt that the trial in this case will involve a question of how much fault was the tow's failure design, if we're able to prove that, versus how bad the pilots were. And a fact finder will determine what degree of fault the defendants have here. And let me go to a very critical point that was raised, the Detroit case. That accident happened six years before this accident aircraft rolled off the assembly line. 1997, this aircraft was manufactured in 1993. Between that time, the NTSB, investigating the Detroit crash, made findings that recommended having a better system to alert the flight crew to the failure of the tow system. And it said that even highly experienced airline pilots with unblemished safety records can fail to properly set and verify takeoff configuration. This is something that has happened time and time again. In the final commission report from the Spanish Investigatory Commission, Boeing sent records to them. This is in the record through their judicial notice of the total number of takeoff configuration failures in the past period of time, maybe 20 years. There were some 100 or 160. A huge number of them were as a result of the failure of power to the tow system. The federal interests, and I'm trying the court's patience, so I'll wrap up. The federal interests are paramount in this case. It's a distinguishing feature. The district judge, if you look at two statements from his opinion, failed to credit the distinct nature of those interests and the effect of the stipulations. He said, number one, quote, the dispute is over who or what is responsible for the slats and flaps improper configuration, page two. That's not in dispute. That's conceded. Two, he said, quote, what happened in the cockpit immediately before the crash is of central importance, close quote, page 20. Not in dispute. Not in central importance for the trial in this case, which involves a distinctly American debate about whether or not this product satisfied United States federal aviation safety regulations. The plane was certified under U.S. law for U.S. standards. That's the standard that we have to say it didn't meet. That's the standard that they have to say it did meet. It's a United States federal interest. And based upon these factors, particularly in light of the concessions that the  It did not appreciate that nuance. And it really does cry out for a reversal in this case. Thank you. All right. Fine. This matter is submitted.
judges: Pregerson, Paez, Hurwitz